**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| ANTHONY WAGAR,<br><br>      Plaintiff,<br><br>v.<br><br>GATEWAY ENERGY SERVICES<br>CORPORATION,<br><br>      Defendant. |

Civil Action No. _____

Class Action Complaint

Plaintiff Anthony Wagar, by his attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for his class action complaint, alleges, with personal knowledge as to his own actions, and upon information and belief as to those of others, as follows:

## <u>NATURE OF THIS CASE</u>

1. This action seeks to redress the deceptive and bad faith pricing practices of Gateway Energy Services Corporation ("Gateway" or "Defendant") that have caused thousands of residential consumers to pay considerably more for their electricity than they should otherwise have paid.

2. Defendant has taken advantage of the deregulation of the retail electricity market by luring consumers into switching electricity suppliers with false promises that it offers a market based variable rate for electricity.

3. Defendant's representations are deceptive. In reality, Defendant's variable rates are substantially higher than those otherwise available in the electricity market, and its rates do not reflect changes in the wholesale cost Defendant pays for the electricity it supplies to its retail

customers.  As a result, unsuspecting consumers are being fleeced millions of dollars in exorbitant charges for electricity.

4.      This suit is brought pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. 56: 8-1 *et seq*. and the common law on behalf of a class of Gateway residential consumers who were charged a variable rate for electricity by Gateway from November 2012 to the present.  It seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

5.      Plaintiff Anthony Wagar is a citizen of New Jersey residing in Colts Neck, New Jersey.  Mr. Wagar was a customer of Gateway from 2010 through approximately September 2018, and as a result of Defendant's deceptive conduct, he incurred excessive charges for electricity.

6.      Defendant Gateway is a citizen of New York, having been organized under the laws of New York, and during the time Plaintiff was a Gateway customer, Gateway had a principal place of business or corporate headquarters in Montebello, New York, in Rockland County.  Gateway's registered agent is in Nyack, Rockland County, New York.  Defendant has thousands of customers in New Jersey, and tens of millions of dollars in revenues.

## JURISDICTION

7.      Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

8.      The Court has personal jurisdiction over Defendant because it is incorporated in New York and used to be headquartered in this judicial district, and because Gateway's registered agent is in Nyack, Rockland County, New York.

## OPERATIVE FACTS

### The History Of New Jersey's Energy Industry

9.      In 1999, New Jersey's legislature and the New Jersey Board of Public Utilities ("NJBPU") deregulated the market for electricity.  Among the goals of the reorganization were increased competition and deregulation within the industry, with an eye towards achieving greater consumer choice and an overall reduction of energy rates.  As a result, the State's electric industry is open to competition, and consumers may choose their supplier of energy.

10.     The new energy suppliers, who compete against local utilities such as Public Service Electric and Gas Company ("PSE&G"), are known as energy service companies, or "ESCOs."  While ESCOs supply the electricity, local utilities continue to deliver the commodity to consumers' homes.  The local utility also continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is which company sets the price for the customer's energy supply.

11.     Before deregulation, retail residential consumers had to purchase both the supply and the delivery of electricity from the local utility.  The public policy motivation for allowing consumers a choice of energy suppliers is to enable retail customers to take advantage of competition between suppliers in the open market, as compared to the monopolistic and heavily regulated utility.  The premise behind this policy is that competition would result in ESCOs being more aggressive and creative than the monopoly utility in reducing wholesale purchasing costs and thereby lower prices for retail customers.

12.     Consumers who do not choose to switch to an ESCO for their energy supply continue to receive their supply from their local utility.

13.     In New Jersey, the NJBPU holds market-based auctions for utilities to purchase electricity at wholesale on a three-year rolling basis on behalf of its customers.  Pursuant to the Electric Discount and Energy Competition Act of 1999, the power procured by utilities must be purchased at prices consistent with market conditions.  A third-party consultant manages the auctions on behalf of the NJBPU, and the bidding processes and results are made publicly available.  As a result, these auctions reflect market-determined prices.  Utilities then charge their customers a rate based on market prices for supply obtained in the competitive wholesale marketplace, plus other wholesale costs, namely transmission, capacity, ancillary, congestion, and administrative costs as determined by the NJBPU -- without any markup or profit.  Because New Jersey utility rates do not include any profits, they serve as pure reflections of average market costs of wholesale electricity, and associated costs.

14.     ESCOs such as Gateway have various options to buy electricity at wholesale for resale to retail customers, including: owning generation plants; purchasing from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer (*i.e.*, the spot market); and by purchasing in advance of the time it is used by consumers, either by purchasing energy to be used in the future or by purchasing futures contracts for the delivery of energy in the future at a predetermined price (*i.e.*, futures or swaps).  The purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce electricity costs, and pass those savings on to consumers.

15.     Therefore, ESCOs should be able to offer rates competitive with, or substantially lower than, utilities, and in fact many do.  Indeed, Gateway and its parent corporation Direct

Energy, offered fixed rates during the time Plaintiff was a Gateway customer that were competitive with or much lower than New Jersey utility rates.

16.     As part of the deregulation plan, ESCOs (like Gateway) do not have to file or seek approval for the electricity rates they charge or the methods by which they set their rates with the NJBPU.

17.     Gateway exploits deregulation and the lack of regulatory oversight in the energy market by luring customers with enticing teaser rates and false promises that it will offer market-based variable rates when, in fact, Gateway's rates are substantially higher than its own fixed rates, competing ESCOs rates, and the local utilities' rates, and are untethered from changes in wholesale rates.

**Mr. Wagar's Experience**

18.     In 2010, Gateway offered to provide Mr. Wagar electricity services.  In a telephone conversation in which the representative likely used a standard and uniform sales pitch, Gateway offered Mr. Wagar a market variable rate

19.     The representation that Gateway's variable rate would be based on market prices was reinforced by Defendant's standard Residential Terms & Conditions, which Gateway sent to Mr. Wagar after his initial phone conversation with the Gateway representative.

20.     Gateway then provided Mr. Wagar its standard and uniform Residential Terms & Conditions that would govern their relationship.  Gateway also provided Mr. Wagar with a fourteen-day rescissionary period during which he could rescind the Terms & Conditions prior to its commencement should he not agree to its terms.  During that rescissionary period, the Terms & Conditions served as a solicitation in which Gateway identified the basis upon which the promised market-based variable rate would be determined.

21.     The Terms & Conditions contain a prominent section that represents the manner

in which Gateway promises to set the variable rate:

*Variable-Rate Plan:*  The price for all electricity or natural gas sold under our Variable-Rate Plan is a rate set by us each month based on our evaluation of a number of factors that affect the total price of electricity or natural gas to a customer.  The following description is not exhaustive of all factors that may influence our pricing decision each month, but it does describe the major components that influence our analysis in a typical month.  Each month our management uses the information described below, along with numerous other considerations, to determine how low a price we can charge in the upcoming month.

- We determine the cost of all electricity or natural gas (including, where applicable, transmission costs, storage costs, transportation costs and line losses) that we have already obtained for delivery to customers in your utility territory for the upcoming month.  Because we often acquire supply over time in preparation for future delivery needs (in an effort to mitigate the volatility in price) and do not acquire all of our required electricity or natural gas from the spot market, our supply costs may not directly follow spot market prices.
- If additional supplies of electricity or natural gas will be required for the upcoming month, we will determine the anticipated cost to acquire such additional supplies from the spot market.
- If we expect to have surplus supply for the upcoming month, we evaluate the expected income we may receive from selling the surplus.  Additionally, with electricity, we may expect to have surplus or shortfall in any given hour of the upcoming month.  In this case, we evaluate the expected income or costs that may be incurred by eliminating the surplus or shortfall.
- We evaluate, if known, the prices that your utility and other competitors in your area plan to charge in the upcoming month.
- We evaluate the amount of profit we hope to earn from the sale of electricity or natural gas in your utility territory.
- We evaluate any taxes that must be included in the rate we charge for electricity or natural gas in your jurisdiction.
- From time to time, and as a direct result of sudden or drastic increases in price, we may experience a higher level of cost to supply our customers than we wish to bill our customers in a single period.  In these circumstances, we may amortize this expense to our customers over multiple billing cycles.

22.     Any reasonable consumer would understand based on these representations that

Defendant's variable rate would reflect Defendant's costs for purchasing electricity at wholesale,

and that the variable rate would be competitive with the rate offered by the local utility and other

ESCOs.  Mr. Wagar reasonably expected that Gateway's variable rates for electricity would be

based on market conditions, *i.e.*, competitive and reflective of Gateway's wholesale cost for purchasing electricity.

23.    Mr. Wagar switched from Jersey Central Power & Light ("JCPL") to Gateway for electricity in 2010, and he paid Gateway's variable price until approximately September 2018. For example, the following table identifies the billing periods beginning in January 2017 during which Mr. Wagar was enrolled in Gateway's electricity services, the variable rate Gateway charged Mr. Wagar, the corresponding rate JCPL would have charged (which, as discussed below, is a reasonable representation of a rate based on wholesale market conditions), and the differences between Gateway's and JCPL's contemporaneous rates:

| Billing Period | Gateway Rate Per kWh[1] | JCPL Rate Per kWh | Difference Per kWh | Percent Difference |
|---|---|---|---|---|
| 1/11/17-2/7/17 | $0.154900 | $0.104168 | $0.050732 | 48.70% |
| 2/8/17 – 3/8/17 | $0.154900 | $0.102102 | $0.052798 | 51.71% |
| 3/9/17 – 4/6/17 | $0.154900 | $0.097231 | $0.057669 | 59.31% |
| 3/9/17 – 4/9/17 | $0.154900 | $0.097230 | $0.057670 | 59.31% |
| 4/7/17 – 5/8/17 | $0.156150 | $0.097230 | $0.058920 | 60.60% |
| 5/9/17 – 6/9/17 | $0.159900 | $0.092240 | $0.067660 | 73.35% |
| 6/10/17 – 7/11/17 | $0.164025 | $0.092469 | $0.071556 | 77.38% |
| 7/12/17 – 8/8/17 | $0.172929 | $0.092353 | $0.080576 | 87.25% |
| 8/9/17 – 9/8/17 | $0.175500 | $0.091593 | $0.083907 | 91.61% |
| 9/9/17 – 10/10/17 | $0.176906 | $0.094865 | $0.082041 | 86.48% |
| 10/11/17 – 11/9/17 | $0.178350 | $0.094879 | $0.083471 | 87.98% |
| 11/10/17 – 12/8/17 | $0.172155 | $0.095463 | $0.076692 | 80.34% |
| 12/9/17 – 1/10/18 | $0.165576 | $0.096929 | $0.068647 | 70.82% |
| 1/11/18 – 2/8/18 | $0.162448 | $0.096771 | $0.065677 | 67.87% |
| 2/9/18 – 3/9/18 | $0.166390 | $0.100056 | $0.066334 | 66.30% |
| 3/10/18 – 4/7/18 | $0.187700 | $0.101599 | $0.086101 | 84.75% |
| 4/8/18 – 5/7/18 | $0.186813 | $0.101634 | $0.085179 | 83.81% |
| 5/8/18 – 6/7/18 | $0.182026 | $0.092946 | $0.089080 | 95.84% |
| 6/8/18 – 7/10/18 | $0.186964 | $0.086699 | $0.100265 | 115.65% |
| 7/11/18 – 8/8/18 | $0.213100 | $0.086862 | $0.126238 | 145.33% |
| 8/9/18 – 9/10/18 | $0.214070 | $0.090937 | $0.123133 | 135.40% |

---

[1]  Electricity is sold to consumers by the kilowatt hour, or kWh.

24.     That Defendant's variable rate is not in fact a competitive market rate based on the wholesale cost of electricity is demonstrated by the fact that Defendant's rate was significantly higher than JCPL's rates.  For example, from January 2017 to September 2018, Gateway's rate was higher than JCPL's rate *every single month*.  On average, during this period, Gateway's rates were 82% higher than JCPL's rates.  In fact, there were several months where Defendant's rate was *more than double* JCPL's rate.

25.     Not only is JCPL Gateway's primary competitor in Mr. Wagar's service territory (as the utility virtually always is), but JCPL's rates are also an ideal indicator of market prices because they are based on publicly held auctions.  While JCPL and Gateway may not purchase electricity in precisely the same manner, over time the costs they incur should be commensurate. Indeed, Defendant represents in its Terms & Conditions that it purchases electricity supply in advance to mitigate potential price spikes.  Similarly, JCPL and other New Jersey utilities purchase electricity for present and future use in three-year rolling auctions (each year the utility buys one third of the electricity it needs for year one, one third for year two, and one third for year three), which is also designed to mitigate market volatility and price spikes.

26.     In fact, Gateway has a tactical advantage over the utility as it can purchase electricity from any number of markets using any number of purchasing and hedging strategies, and therefore its cost for purchasing electricity should at the very least reflect -- if not undercut – utility prices.

27.     Additionally, in its Terms & Conditions, Defendant represents that one of its major considerations in setting prices is the price that utilities charge for electricity.  In spite of this representation and customers' resulting reasonable expectations, Gateway's rate is invariably higher than the local utility's rate.

28.     Therefore, while JCPL's rates may not precisely match Defendant's rate, they should be commensurate.  But they are instead wildly disparate.

29.     The fact that, over time during extended periods, JCPL's rates decreased while Gateway's increased demonstrates both that Gateway's variable rate is not competitive with the utilities, but also that Gateway's rates do not reflect changes in its costs to acquire the electricity it sells to its customers.  For example, from January 2017 until September 2017, a nine month period, Gateway's rate increased from $0.1549 per kWh to $0.1755 per kWh, an increase of 13.3%.  In contrast, JCPL's rates decreased from $0.1042 per kWh to $0.965 per kWh, a reduction of 12%.  Over the entire 21-month period from January 2017 to September 2018, Gateway's rate increased from $0.1549 per kWh to $0.2141 per kWh, an increase of 38%, while the JCPL rate declined from $0.1042 per kWh to $0.909 per kWh, a reduction of 12.7%.

30.     That Defendant's rates do not reflect market costs for wholesale electricity is also demonstrated by the disconnect between changes in wholesale electricity prices (as demonstrated by the PJM wholesale rate) and Defendant's costs.  While the PJM wholesale rate might show more short term fluctuations than Defendant's costs (because Defendant claims that it does not purchase all of its electricity on the spot market), over time, the PJM wholesale rate is an accurate reflection of wholesale market costs.

31.     The following table identifies the most recent 21 billing periods during which Mr. Wagar was enrolled in Gateway's variable rate, Gateway's variable price for that period, and the Weighted LMP Plus Other Wholesale Costs", which is the total cost for both the weighted average locational marginal price (the commodity price for electricity) and the other wholesale costs an ESCO incurs for selling electricity (namely transmission, capacity, ancillary, and congestion costs) in JCPL's service territory.  The locational marginal price ("LMP") is a

benchmark used in the PJM territory (which consists of New Jersey, Pennsylvania, and Maryland) to establish the price of electricity purchases and sales in specific geographic locations. The "Weighted LMP Plus Other Wholesale Costs" below reflects the Day-Ahead LMP adjusted upward to reflect that more electricity is purchased when demand, and consequently the LMPs, are higher.  PJM is market administrator and updates the market rate on hourly basis.

| Billing Period | Gateway Rate Per kWh[2] | Weighted LMP Plus Other Wholesale Costs |
|---|---|---|
| 1/11/17-2/7/17 | $0.154900 | 0.056585 |
| 2/8/17 – 3/8/17 | $0.154900 | 0.046777 |
| 3/9/17 – 4/6/17 | $0.154900 | 0.056892 |
| 3/9/17 – 4/9/17 | $0.154900 | 0.056892 |
| 4/7/17 – 5/8/17 | $0.156150 | 0.052520 |
| 5/9/17 – 6/9/17 | $0.159900 | 0.050900 |
| 6/10/17 – 7/11/17 | $0.164025 | 0.047161 |
| 7/12/17 – 8/8/17 | $0.172929 | 0.052255 |
| 8/9/17 – 9/8/17 | $0.175500 | 0.045824 |
| 9/9/17 – 10/10/17 | $0.176906 | 0.043754 |
| 10/11/17 – 11/9/17 | $0.178350 | 0.044852 |
| 11/10/17 – 12/8/17 | $0.172155 | 0.047839 |
| 12/9/17 – 1/10/18 | $0.165576 | 0.070550 |
| 1/11/18 – 2/8/18 | $0.162448 | 0.151492 |
| 2/9/18 – 3/9/18 | $0.166390 | 0.046435 |
| 3/10/18 – 4/7/18 | $0.187700 | 0.048316 |
| 4/8/18 – 5/7/18 | $0.186813 | 0.047973 |
| 5/8/18 – 6/7/18 | $0.182026 | 0.047629 |
| 6/8/18 – 7/10/18 | $0.186964 | 0.047045 |
| 7/11/18 – 8/8/18 | $0.213100 | 0.056959 |
| 8/9/18 – 9/10/18 | $0.214070 | 0.057096 |

32.     The fact that Gateway's rate does not rise and fall when wholesale costs rise and fall demonstrates that the primary component affecting the variable rate is not Gateway's wholesale costs.  For example, the wholesale price of electricity dropped from $0.057 per kWh in February 2018 to $0.047 per kWh in July 2017, a reduction of 17%, while Gateway's rates

---

[2]  Electricity is sold to New Jersey consumers by the kilowatt hour, or kWh.

rose 5%, from $0.15 to $0.16.  Even when wholesale costs rise, Gateway's rates rise steeply in a manner disconnected from wholesale cost increases.  For example, wholesale costs increased only $.011 from February 2018 to September 2018, yet Gateway's rate increased by a staggering $.048.

33.     The cost of wholesale electricity is the primary component of the non-overhead costs Defendant incurs.  Indeed, Defendant concedes and represents as much, listing the "cost of . . . electricity" as the first factor in the "major components that influence our analysis in a typical month."

34.     As explained above, the other factors Defendant identified in the Terms & Conditions other than the wholesale cost of electricity that affect its variable rate in (such as capacity, transmission costs, transportation costs, and line losses) are included in the Weighted LMP Plus Other Wholesale Costs figures above.  These additional wholesale costs are relatively insignificant in terms of the overall costs Defendant incurs to provide retail electricity, and do not substantially fluctuate over time.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates, just as Gateway itself did for its fixed rate offerings.

35.     Additionally, because utility prices reflect a rolling three-year purchasing strategy, utility prices necessarily reflect the cost that ESCOs such as Gateway incur when they purchase, or hedge, future electricity.

36.     Therefore, these other cost factors cannot explain the drastic increases in Defendant's variable rate or the reason its rates are disconnected from changes in wholesale costs.

37.     Defendant's identification of "profit" amongst the factors it considers does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will

attempt to make a reasonable profit by selling consumers retail electricity.  However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of electricity in the market, and also that Defendant's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead outrageously higher.

38.     Defendant's statements and omissions regarding its electricity rates are materially misleading because the most important consideration for any reasonable consumer when choosing an energy supplier is price.  In fact, all that Defendant offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by other ESCOs or local utilities.  Other than potential price savings, there is nothing to differentiate Defendant from other ESCOs or local utilities, and the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with Defendant.

39.      Defendant knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to the rate being market based were made for the sole purpose of inducing consumers to sign up for Defendant's electricity supply so that it can reap outrageous profits to the direct detriment of consumers without regard to the consequences high utility bills cause such consumers.  As such, Defendant's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all Gateway customers, other than citizens of New York, who were charged a variable rate for residential

electricity services by Gateway from November 2012 to the present and whose customer agreement contained substantially similar variable rate terms.

41.     Plaintiff also brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a subclass (the "Subclass") of New Jersey Gateway customers who were charged a variable rate for residential electricity services by Gateway from Novemvber 2012 to the present.

42.     Excluded from the Class and Subclass are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendant.

43.     This action is brought as a class action for the following reasons:

a.     The Classes consist of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.     There are questions of law or fact common to the Classes that predominate over any questions affecting only individual members, including:

i.     whether Defendant violated N.J.S.A. 56: 8-1 *et seq.*;

ii.     whether Defendant breached its contract with its customers  by charging variable rates not based on the specified factors;

iii.     whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, *i.e.*, to price gouge;

iv.      whether Plaintiff and the Classes have sustained damages and, if so, the proper measure thereof; and

v.        whether Defendant should be enjoined from continuing to charge variable rates not based on market conditions;

c.        The claims asserted by Plaintiff are typical of the claims of the members of the Classes;

d.        Plaintiff will fairly and adequately protect the interests of the Classes, and Plaintiff has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCOs;

e.        Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

f.        Defendant has acted on grounds that apply generally to the Classes, namely representing that its variable rates are based on market conditions, *i.e.*, competitive and reflective of the wholesale market, when Defendant's rates are in fact substantially higher, such that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Classes;

g.        A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i.        Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

ii.        It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

iii.     When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Classes;

iv.     A class action will permit an orderly and expeditious administration of claims, foster economies of time, effort, and expense and ensure uniformity of decisions;

v.     The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi.     Defendant has acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

44.     Defendant's violations of N.J.S.A. 56: 8-1 *et seq*. are applicable to all members of the Subclass, and its violations of the common law are applicable to all members of the Class, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## FIRST CAUSE OF ACTION
### (Breach of Contract on behalf of the Class)

45.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

46.     Gateway customers in New Jersey, and others in other states, have customer agreements whose variable rate terms are substantially similar.

47.     Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity.

48.     Pursuant to the Agreement, Defendant agreed to charge a variable rate for electricity based on market conditions, in particular, its cost of purchasing electricity for delivery to customers from the same utility territory, and the prices charged by local utility

companies and other competitors.

49.     Pursuant to the Agreement, Plaintiff and the Class paid the variable rates Defendant charged for electricity.

50.     However, Defendant failed to perform its obligations under the Agreement to charge rates based primarily upon electricity costs and the rates utilities and other ESCOs chage.  Indeed, Defendant charged a variable rate for electricity that was untethered from the factors upon which the parties agreed the rate would be based.

51.     Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based its rate on the agreed upon factors.

52.     By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

**SECOND CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith & Fair Dealing on Behalf of the Class)**

53.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

54.     Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

55.     Under the contract, Defendant had unilateral discretion to set the variable rate for electricity based on market conditions and other factors, such as the amount of profit Defendant hoped to earn from the sale of electricity in a customer's utility area.

56.     Plaintiff reasonably expected that the variable rates for electricity would,

notwithstanding Defendant's profit goals, reflect the market and wholesale prices for electricity and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class members would not have agreed to buy electricity from Defendant.

57.     Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiff and other Class members' reasonable expectations that the variable rate for electricity would be commensurate with market conditions.

## THIRD CAUSE OF ACTION
### (Violation of N.J.S.A. 56: 8-1 *et seq*. on Behalf of the Subclass)

58.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

59.     The Consumer Fraud Act prohibits, *inter alia*:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise. . . .

N.J.S.A. § 56:8-2.

60.     Defendant's misrepresentations and false, deceptive, and misleading statements and omissions with respect to the variable rates it charges for electricity, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity in violation of the Consumer Fraud Act.

61.     Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase electricity from Gateway.

62.     Defendant also failed to inform customers that its variable rates for electricity are substantially higher than those based on the market price of electricity and do not reflect the wholesale cost of purchasing electricity.  That information would have been material to any consumer deciding whether to purchase electricity from Gateway.

63.     Defendant makes these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

64.     Defendant's intentional concealments are designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with market conditions and the specified factors in the Terms & Conditions.  By concealing its actual pricing strategy (*i.e.*, maximizing price gouging), Defendant benefits from reliance and deprives consumers from informed purchasing decisions and savings.

65.     Defendant's affirmative conduct and omissions constitute unlawful practices beyond a mere breach of contract.  Rather, Defendant's practices are unconscionable and outside the norm of reasonable business practices.

66.     Plaintiff and the other members of the Subclass entered into agreements to purchase electricity from Defendant for personal use and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the Consumer Fraud Act.

67.     As a consequence of Defendant's wrongful actions, Plaintiff and the other members of the Subclass suffered an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on market conditions and the factors specified in the Terms & Conditions or had they not switched to Defendant from their previous supplier.

68.     Plaintiff and other members of the Subclass suffered an ascertainable loss

caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates had been known.

69.     By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Subclass for trebled compensatory damages, punitive damages, attorneys' fees, and the costs of this suit.  N.J.S.A. §§ 56:8-2.11, 8-2.12, 8-19.

70.     Gateway knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to the rate being market based are made for the sole purpose of inducing consumers to sign up for Gateway's electricity supply so that it can reap outrageous profits to the direct detriment of New Jersey consumers without regard to the consequences high utility bills cause such consumers.  As such, Defendant's actions are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, or accompanied by wanton and willful disregard for consumers' well-being.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

71.     As a result of Defendant's breach, Defendant is liable to Plaintiff and other Subclass members for actual damages in an amount to be determined at trial and attorney's fees.

WHEREFORE, Plaintiff respectfully requests that the Court should enter judgment against Defendant as follows:

1.      Certifying this action as a class action, with a class and subclass as defined above;

2.      On Plaintiff's First Cause of Action, awarding against Defendant damages that Plaintiff and the other members of the Class have suffered, trebled, and granting appropriate injunctive relief;

3.      On Plaintiff's Second Cause of Action, awarding against Defendant damages that Plaintiff and the other members of the Class have suffered as a result of Defendant actions;

4.      On Plaintiff's Third Cause of Action, awarding against Defendant damages that Plaintiff and the other members of the Subclass have suffered as a result of Defendant's actions;

5.      Awarding Plaintiff and the Classes punitive damages;

6.      Awarding Plaintiff and the Classes interest, costs and attorneys' fees; and

7.      Awarding Plaintiff and the Classes such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a trial by jury.

Dated:      November 5, 2018
            White Plains, New York

                        **FINKELSTEIN, BLANKINSHIP,**
                        **FREI-PEARSON & GARBER, LLP**


                        D. Greg Blankinship
                        Todd G. Garber
                        Chantal Khalil
                        445 Hamilton Avenue
                        White Plains, New York 10601
                        Tel: (914) 298-3281
                        Fax: (914) 824-1561
                        gblankinship@fbfglaw.com
                        tgarber@fbfglaw.com
                        ckhalil@fbfglaw.com

                        *Attorneys for Plaintiff and the Putative Class*

{00296449 }                          21